UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LIONEL CHAN,<br><br>Petitioner,<br><br>v.<br><br>ANTONE MONIZ, Superintendent, Plymouth County Correctional Facility; DAIVD T. WESLING, Field Office Director of Enforcement and Removal Operations, Boston Field Office, Immigration and Customs Enforcement; MARKWAYNE MULLIN, Secretary, U.S. Department of Homeland Security; U.S. DEPARTMENT OF HOMELAND SECURITY; TODD BLANCHE, Acting U.S. Attorney General; EXECUTIVE OFFICE FOR IMMIGRATION REVIEW<br><br>Respondents. | Case No.<br><br>**PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

1. This is a habeas corpus action brought under 28 U.S.C. § 2241 by Lionel Chan, a lawful permanent resident of the United States who has lived in this country, peaceably and productively, for more than two decades. Mr. Chan is married to a United States citizen, has an I-130 immigrant petition pending on his behalf, has no prior immigration violations, and has complied with every condition of supervision imposed upon him by the federal courts and federal agencies over the course of more than six years—first in his criminal case, and then throughout the four-plus years that his removal proceedings have been pending.

2. On Friday, April 10, 2026, U.S. Immigration and Customs Enforcement ("ICE") officers ambushed Mr. Chan without notice, refused to show him a warrant,

and within roughly ninety seconds of the encounter broke the window of his vehicle and forcibly removed him. He was taken to the Plymouth County Correctional Facility in Plymouth, Massachusetts, where he is presently confined without bond and without any hearing on whether his detention is necessary.

3. The government justifies this detention not by any statute enacted by Congress, but by a regulation the Executive Branch wrote for itself: 8 C.F.R. § 1003.19(h)(2)(i)(C). That regulation purports to strip IJs of jurisdiction to hold bond hearings for any noncitizen "described in [8 U.S.C. § 122]7(a)(4) "—including 8 U.S.C. § 1227(a)(4)(A)(i), the provision on which DHS has charged Mr. Chan. Congress, however, did not put § 1227(a)(4)(A) on the mandatory-detention list. When Congress enumerated the categories of noncitizens subject to mandatory detention without a bond hearing, it expressly included § 1227(a)(4)(B) (terrorist activities) but deliberately left § 1227(a)(4)(A) (general security, export violations) off the list. See 8 U.S.C. § 1226(c)(1)(D).

4. Under the most fundamental canon of statutory construction—*expressio unius est exclusio alterius*—Congress's decision to include (a)(4)(B) while omitting (a)(4)(A) is determinative. The Executive cannot, by regulation, put back what Congress took out. Because 8 C.F.R. § 1003.19(h)(2)(i)(C) sweeps in a category of noncitizens that Congress deliberately withheld from § 1226(c), the regulation is ultra vires as applied to Mr. Chan, and his detention pursuant to it is unlawful.

5. Mr. Chan is not challenging his removability. Whether he is ultimately found removable under § 1227(a)(4)(A)(i) is a matter for the immigration court, the Board of Immigration Appeals ("BIA"), and then a U.S. Court of Appeals on Petition

for Review (hereinafter "PFR"). The sole question here is whether the Executive may, through a regulation Congress did not authorize, strip Mr. Chan of the individualized bond hearing Congress guaranteed him under 8 U.S.C. § 1226(a). It cannot.

6. Mr. Chan's continued detention also violates the Fifth Amendment's Due Process Clause. Applying the three-factor balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), each factor weighs decisively in Mr. Chan's favor. His interest in physical liberty is the most elemental of liberty interests. The risk of erroneous deprivation is acute, because the regulation categorically forecloses any individualized inquiry into whether he is a flight risk or a danger—questions already answered against the government by four-plus years of faithful compliance on bond. And the government has no legitimate interest in confining a person it has already agreed is eligible to re-adjust his status and whose I-130 has been pending before DHS—the same agency who has spent years seeking to justify its pursuit of removal proceedings against Mr. Chan—since December 2024.

7. Mr. Chan respectfully asks this Court to grant the Petition, declare 8 C.F.R. § 1003.19(h)(2)(i)(C) ultra vires and unconstitutional as applied to him, and order his immediate release on the conditions that governed his liberty on the day ICE arrested him: release on a $15,000 bond.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction under 28 U.S.C. § 2241 (habeas corpus); Article I, § 9, cl. 2 of the United States Constitution (the Suspension Clause); 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 1651 (the All Writs Act); 28 U.S.C.

§§ 2201–2202 (the Declaratory Judgment Act); and the Fifth Amendment to the United States Constitution.

9. Mr. Chan challenges the legality of his physical detention by Executive officers acting under color of federal authority. The First Circuit has repeatedly reaffirmed that "district courts retain jurisdiction over challenges to the legality of detention in the immigration context." *Kong v. United States*, 62 F.4th 608, 614 (1st Cir. 2023); *see also Hernandez-Lara v. Lyons*, 10 F.4th 19 (1st Cir. 2021). The jurisdiction-channeling provisions of 8 U.S.C. §§ 1226(e) and 1252(b)(9) do not bar this action. Section 1226(e) withdraws review only of "discretionary" custody determinations; it does not touch legal and constitutional challenges to the framework under which custody decisions are made. *Demore v. Kim*, 538 U.S. 510, 516–17 (2003); *Jennings v. Rodriguez*, 583 U.S. 281, 294–95 (2018). Section 1252(b)(9) likewise does not channel challenges to detention, which are collateral to the merits of removal. *Jennings*, 583 U.S. at 292–95.

10. Venue is proper in this District under 28 U.S.C. § 2241 and *Rumsfeld v. Padilla*, 542 U.S. 426 (2004), because Mr. Chan is physically confined in this District at the Plymouth County Correctional Facility in Plymouth, Massachusetts, and his immediate custodian, Superintendent Antone Moniz, resides and performs his duties in this District. Venue is also proper under 28 U.S.C. § 1391(e) because Respondent Wesling, the ICE Acting Field Office Director for the Boston Field Office, resides and performs his official duties in this District, and a substantial part of the events giving rise to this claim—Mr. Chan's arrest and detention—occurred within this District.

## PARTIES

11. Petitioner Lionel Chan is a 42-year-old lawful permanent resident of the United States, a native of Malaysia, and the husband of a United States citizen. He is currently confined at the Plymouth County Correctional Facility in Plymouth, Massachusetts. A-file No. A207-551-095.

12. Respondent Antone Moniz is employed by the Plymouth County Correctional Facility as the Supervisor of the Plymouth County Correctional Facility, where Petitioner is detained. He is the physical custodian of Petitioner and is named in his official capacity.

13. Respondent David T. Wesling is the Director of the Boston Field Office of ICE's Enforcement and Removal Operations division. As such, David Wesling is Petitioner's immediate custodian and is responsible for Petitioner's detention and removal. He is named in his official capacity.

14. Respondent Markwayne Mullin is the U.S. Secretary of Homeland Security. He is responsible for the implementation and enforcement of the Immigration and Nationality Act (INA) and oversees ICE, which is responsible for Petitioner's detention. He is a legal custodian of Petitioner and is named in his official capacity.

15. Respondent Department of Homeland Security (DHS) is the federal agency responsible for implementing and enforcing the INA, including the detention and removal of noncitizens.

16. Respondent Todd Blanche is the Acting Attorney General of the United States. He is responsible for the Department of Justice, of which the Executive Office for Immigration Review and the immigration court system it operates is a component agency. He is sued in his official capacity.

17. Respondent Executive Office for Immigration Review (EOIR) is the federal agency responsible for implementing and enforcing the INA in removal proceedings, including for custody redeterminations in bond hearings.

## LEGAL FRAMEWORK

18. As a threshold matter, this petition does not involve or implicate any provision of 8 U.S.C. § 1225. It is undisputed that Mr. Chan is a lawful permanent resident who was present in the United States as an admitted noncitizen when encountered by ICE and placed in removal proceedings under 8 U.S.C. § 1229a in March 2022. This petition does, however, challenge the claim advanced by both DHS and EOIR that Mr. Chan—a lawful permanent resident—is subject to mandatory detention for the entire duration of his removal proceedings, and that as a consequence, an IJ lacks jurisdiction to grant him a bond regardless of how plainly he is neither a flight risk nor a danger to the community.

19. Critically, the mandatory detention that DHS and EOIR seek to impose on Mr. Chan is not grounded in any statutory provision—including 8 U.S.C. § 1226(c), the sole statutory mechanism Congress created for mandatory detention during removal proceedings. The provisions of § 1226(c) are, however, directly relevant to the issues presented, because they reveal the precise boundaries Congress drew around mandatory detention and, by extension, the limits of DHS's and EOIR's authority to expand those boundaries by regulation.

### I. The applicable statutory framework.

A. Section 1226 and the Congressional Framework for Detention and Bond

20. Prior to IIRIRA, the general rule governing noncitizens in deportation proceedings was that they were entitled to seek a bond or bond redetermination from an

IJ, subject to only a few limited exceptions. IIRIRA replaced the prior framework with the detention and bond provisions now codified at 8 U.S.C. § 1226, which remain in force today in substantially the same form Congress enacted them—aside from amendments added by the Laken Riley Act, which are not relevant to this case.

21. Under § 1226(a), the Attorney General is authorized to arrest, detain, and release on bond noncitizens who are in removal proceedings—the default framework that preserves the longstanding right to an individualized bond determination before an IJ. In contrast, § 1226(c) creates a narrow exception to this default: mandatory detention without bond for noncitizens who fall within specifically enumerated categories. As enacted (prior to the Laken Riley Act amendments), § 1226(c)(1) provided:

> **Detention of criminal aliens.** (1) Custody. The Attorney General shall take into custody any alien who— (A) is inadmissible by reason of having committed any offense covered in section 1182(a)(2) of this title, (B) is deportable by reason of having committed any offense covered in section 1227(a)(2)(A)(ii), (A)(iii), (B), (C), or (D) of this title, (C) is deportable under section 1227(a)(2)(A)(i) of this title on the basis of an offense for which the alien has been sentenced to a term of imprisonment of at least 1 year, or (D) is inadmissible under section 1182(a)(3)(B) of this title or deportable under section 1227(a)(4)(B) of this title.[1]

22. The categories Congress enumerated are specific and deliberate. Subparagraphs (A) through (C) address noncitizens who are inadmissible or removable on the basis of certain criminal convictions. Subparagraph (D) addresses those who are inadmissible under § 1182(a)(3)(B) or removable under § 1227(a)(4)(B)—both of which are titled "Terrorist activities." Notably, Congress included § 1227(a)(4)(B) in the mandatory detention statute but did not include the immediately preceding subparagraph, § 1227(a)(4)(A), which addresses "security and related grounds" such as

---

[1] 8 U.S.C. § 1226(c)(1)(A)–(D) (emphasis added).

espionage, sabotage, and export control violations. That omission is central to this petition.

B. The Joseph Hearing: Agency Check on Mandatory Detention Determinations.

23. Where DHS alleges that a noncitizen falls within one of § 1226(c)'s mandatory detention categories, the noncitizen may request what is known as a *Joseph* hearing, derived from the BIA's decision in *Matter of Joseph*, 22 I&N Dec. 799 (BIA 1999). At such a hearing, the IJ determines whether DHS is "substantially unlikely" to establish that the noncitizen is inadmissible or removable under the specific provision of § 1226(c) on which mandatory detention is predicated. If the IJ concludes that DHS is not substantially likely to carry its burden, the Judge has jurisdiction to set a bond, provided the noncitizen demonstrates that he or she is neither a flight risk nor a danger to the community. The *Joseph* hearing thus serves as an agency-created mechanism ensuring that there is a judicial check on DHS's determinations regarding who must be detained for the duration of proceedings—just as IJs provide a check on DHS's flight risk and dangerousness determinations in the ordinary bond context.

C. Beyond the statutory mandatory detention provisions passed by Congress—regulatory mandatory detention under 8 C.F.R. § 1003.19(h)(2)(i)(C)

24. Although Congress expressly enumerated in § 1226(c) the grounds of inadmissibility and removability that subject a noncitizen to mandatory detention, additional grounds for mandatory detention appear—without explanation—in 8 C.F.R. § 1003.19(h)(2)(i). Relevant to this case, § 1003.19(h)(2)(i)(C) subjects noncitizens "described in section 237(a)(4) of the Act"—that is, 8 U.S.C. § 1227(a)(4) in its entirety—to mandatory detention without the opportunity for an individualized

assessment by an IJ of flight risk or dangerousness. This regulation sweeps far more broadly than the statute it purports to implement. While Congress in § 1226(c)(1)(D) specifically included those removable under § 1227(a)(4)(B) ("Terrorist activities") in the mandatory detention framework, it conspicuously omitted those removable under the preceding subparagraph, § 1227(a)(4)(A) ("Security and related grounds"). The regulation disregards this deliberate statutory distinction.

25. To the best of Petitioner's knowledge, although there does not appear to be a precedential decision explicitly holding that the *Joseph* framework applies to claims of mandatory detention arising under 8 C.F.R. § 1003.19(h)(2)(i)(C) rather than the statutory grounds of § 1226(c), both the BIA and DHS have in practice applied the same standard. That is, unless a noncitizen demonstrates to the IJ that DHS is substantially unlikely to prove removability under § 1227(a)(4)(A), the Judge cannot issue a bond under BIA precedent interpreting § 1003.19. Neither the *Joseph* hearing standard itself nor its applicability to the regulatory mandatory detention provisions at § 1003.19(h)(2)(i) (as distinct from the statutory grounds listed in § 1226(c)) are at issue in this petition. An understanding of the process is, however, necessary to facilitate a discussion of the claims raised herein.

D. <u>DHS and EOIR's position on § 1227(a)(4)(A)(i) and its implications (or contradictions) on mandatory detention.</u>

26. Similarly, the proper interpretation of what DHS must prove to meet its burden of demonstrating by clear and convincing evidence that a lawful permanent resident like Mr. Chan is removable under § 1227(a)(4)(A)(i) is not an issue this Court is being asked to decide. It is, however, critical to understanding the full scope of what

DHS and EOIR claim when they assert that noncitizens "described in" § 1227(a)(4)(A)(i) are subject to mandatory detention.

27. Throughout the four years of Mr. Chan's removal proceedings, DHS and EOIR have maintained that removability under § 1227(a)(4)(A)(i) requires no criminal conviction, no arrest, a violation of a criminal statute is not even necessary—only evidence that the noncitizen violated some law relating to the export of goods from the United States, regardless of how mundane or completely unrelated to national security such a violation may be. With the exception of the IJ who presided over Mr. Chan's *Joseph* hearing in 2022 (hereinafter "Bond-IJ") and a dissenting member of the BIA panel, DHS and EOIR have spent the last four years refusing to engage with Petitioner's argument that, given the context in which § 1227(a)(4)(A)(i) exists—surrounded by provisions addressing espionage, sabotage, sedition, and the gravest threats to national security—DHS must at minimum demonstrate a legitimate national security or foreign policy concern arising from the alleged conduct. DHS has responded, repeatedly, that no such requirement exists and that "any" in the statute carries the broadest possible meaning. In a decision sustaining DHS' appeal of the IJ's grant of bond, two BIA panel members agreed that "any" means "any" and there is no need for a national security or foreign policy nexus.[2]

28. Yet DHS and EOIR simultaneously maintain that anyone found removable under § 1227(a)(4)(A)(i) must be mandatorily detained for the entire duration of removal proceedings—even when the noncitizen is a lawful permanent resident, even when the noncitizen is plainly eligible for relief from removal, and even

[2] (App. Ex. 1 – BIA Bond Decision dated 6/10/2025.)

when the likely outcome of those proceedings is that the noncitizen will remain a lawful permanent resident at their conclusion. The contradiction is stark: § 1227(a)(4)(A)(i) is treated as a national security provision when invoked to justify mandatory detention under 8 C.F.R. § 1003.19(h)(2)(i)(C), but it is treated as a mere "export charge" when the question turns to what DHS must actually prove to establish removability by clear and convincing evidence. DHS cannot have it both ways.

## STATEMENT OF FACTS

### II. Mr. Chan's Life in the United States

29. Petitioner, Lionel Chan, is a native of Malaysia who first came to the United States when he was lawfully admitted as an F-1 student in 2003. During his time as an F-1 student, he attended Berklee College of Music. After graduating with honors (*summa cum laude*), Mr. Chan obtained gainful employment at the Berklee College of Music—and he excelled at it. This led his employer to file an I-140 petition for him, and as a result, Mr. Chan adjusted his status to that of a Lawful Permanent Resident ("LPR") on June 26, 2015.

30. Like school and work, Mr. Chan has demonstrated an admirable dedication to serving others. For example, Mr. Chan served as a volunteer for an Adaptive Learning Program where he helped people with disabilities learn to climb. This is just one of many examples of the positive and significant contributions Mr. Chan has made to his community. Throughout his time in the country, including the past four years, Mr. Chan has built a life here—in legal status the entire time. He has worked consistently for United States employers, developed deep friendships and professional relationships across Massachusetts, and has given generously of his time. In November 2023, Mr. Chan married his longtime girlfriend/fiancé who is a U.S. citizen.

## III. The Airsoft Conviction and Sentencing

31. Though the positive equities in Mr. Chan's case are extensive, he admittedly made a poor decision in 2018 that led to his one and only conviction. As result, Mr. Chan was indicted in the United States District Court for the District of Massachusetts for conspiracy to export items on the munitions list in violation of 22 U.S.C. § 2778 and 18 U.S.C. § 371 in 2019. After a detention hearing, United States Magistrate Judge Kelley granted Mr. Chan pretrial release, finding him neither a flight risk nor a danger to the community. During the roughly two years Mr. Chan was on pretrial release, he was fully compliant with every condition. This led the U.S. probation officer to request that the District Court remove Mr. Chan from the GPS location-monitoring program and curfew, reporting that he had been "nothing but cooperative." The request was granted and Mr. Chan never violated a condition.

32. In 2021, Mr. Chan pleaded guilty to the conspiracy to export charge. At sentencing, the Honorable Mark L. Wolf, United States District Judge for the District of Massachusetts, departed dramatically downward from the advisory guideline range of 57 to 71 months, imposing a sentence of just 8 months. Judge Wolf did so because he found that Mr. Chan's conduct was not "in the heartland of what's contemplated" by U.S.S.G. § 2M5.2, the applicable export-violation guideline, and because he accepted that Mr. Chan "genuinely believed" the parts were being used for the harmless game of airsoft. *See* U.S.S.G. § 2M5.2 cmt. n.1 (authorizing downward departure "in the unusual case where the offense conduct posed no" risk of harm to a United States security or foreign policy interest).

33. Both Judge Wolf and the lead prosecutor made findings and concessions that are decisive here. The prosecutor used the words "no question about it" and "that's undisputed" in confirming that Mr. Chan shipped the parts believing they were to be used solely for airsoft, and further confirmed that the government was **not** claiming Mr. Chan's conduct "caused an actual foreign policy issue or national security issue abroad." Mr. Chan's co-defendant received a sentence of probation—a disposition Judge Wolf described as virtually unprecedented in his thirty-six years on the bench.

34. Mr. Chan self-surrendered, served his 8-month sentence, and was released to ICE custody on March 1, 2022.

## IV. The NTA, the Last-Minute I-261, and the 2022 Bond Hearing

35. On March 9, 2022, DHS served Mr. Chan with a Notice to Appear charging him as removable under 8 U.S.C. § 1227(a)(2)(A)(iii) (aggravated felony—illicit trafficking in firearms) and 8 U.S.C. § 1227(a)(2)(C) (firearms offense). Based on controlling case law, however, Mr. Chan filed a Motion for a *Joseph* hearing based on the fact that he was not removable under either of those provisions in light of the Fifth Circuit's published decision in *United States v. Guillen-Cruz*, 853 F.3d 768 (5th Cir. 2017), which held that a conviction under 22 U.S.C. § 2778 is not an aggravated felony under INA § 101(a)(43)(C).[3]

36. A few hours before the scheduled *Joseph* hearing—DHS filed a Form I-261 adding a charge of removal under 8 U.S.C. § 1227(a)(4)(A)(i). At the same time, DHS took the position that, because Mr. Chan was now charged under § 1227(a)(4), 8

[3] For the same reason it did not constitute an aggravated felony under 8 U.S.C. § 1101(a)(43)(C), (i.e., does not require proof the offense involved a firearm as defined by the National Firearms Act), it did/does not constitute a firearms offense under § 1227(a)(2)(C).

C.F.R. § 1003.19(h)(2)(i)(C) stripped the IJ of jurisdiction to hold a bond hearing unless Mr. Chan could demonstrate DHS was substantially unlikely to prove he was described under § 1227(a)(4)(A)(i) as required under *Matter of Joseph*, 22 I&N Dec. 799 (BIA 1999).

37. The Bond-IJ held a full Joseph hearing on March 25, 2022. After roughly 44 minutes of argument and evidentiary presentation, the Bond-IJ concluded that DHS was substantially unlikely to prevail on the § 1227(a)(4)(A)(i) charge. The Bond-IJ emphasized that § 1227(a)(4)(A)(i)—which appears under the heading "Security and related grounds" and sits alongside subparagraphs addressing espionage, sabotage, Nazi persecutors, terrorists, and torturers—plainly contemplates conduct that poses an actual threat to the security or foreign policy of the United States. The Bond-IJ found that, on the record before him, DHS had not shown Mr. Chan's airsoft conduct fit within that statutory category.

38. The Bond-IJ further determined that Mr. Chan had proven he was neither a flight risk nor a danger, and therefore, bond in the amount of $15,000 was set.

39. DHS reserved and filed an appeal of the bond decision with the BIA. DHS filed its brief in support of the bond appeal in June 2022. Mr. Chan's response brief in opposition to DHS' bond appeal was filed in July 2022.

### V. The § 1227(a)(4)(A)(i) Charge is Sustained; the I-130 is Filed; and Venue is Denied

40. While DHS appeal of the bond decision sat ripe at the BIA, Mr. Chan's removal proceedings were pending before the Dallas EOIR. Through no fault of Mr. Chan's, once he was released on bond, his removal proceedings were moved to the non-detained docket and his first hearing on that docket was scheduled for January 2026. In

March 2023, DHS filed a motion with the IJ requesting that Mr. Chan's hearing be moved up from its 2026 setting. This motion was granted by a different IJ (hereinafter "Removal Proceeding IJ") than the one who had presided over the bond hearing in an order that also informed the parties that she had transferred the case to herself.

41. At hearing on November 20, 2024, the Removal Proceeding IJ indicated that the charge of removal under § 1227(a)(4)(A)(i) on the NTA would be sustained. After the charge was sustained, Mr. Chan identified re-adjustment of status as the relief he would be seeking before the Couret. In so doing, he explained that Mr. Chan's U.S. citizen wife (who he married a year earlier when the only IJ to rule on his removability indicated a belief DHS would not be able to meet its burden) would promptly file an I-130 Petition on his behalf. Approximately one month later, she did precisely that and USCIS issued a receipt notice showing it was received on December 26, 2024.

**VI. The 2025 BIA Decision and Mr. Chan's Continued Compliance on Bond**

42. On June 10, 2025—more than three years after the bond hearing—the BIA issued a 2-1 decision sustaining DHS's appeal. The BIA majority reasoned that § 1227(a)(4)(A)(i) does not require a showing that the conduct at issue in fact harmed or threatened the security or foreign policy of the United States. Board Member O'Connor dissented, agreeing with the Bond-IJ that the statutory language and structure require some nexus to national security or foreign policy.

43. Notwithstanding the BIA's bond decision, ICE did not detain Mr. Chan. Undersigned counsel was given the distinct impression that ICE did not intend to detain Mr. Chan pending the completion of removal proceedings, and Mr. Chan remained on the bond. In the more than three years that passed since DHS appealed the bond

decision, Mr. Chan was the type of husband and member of his community that Judge Wolf expressed a belief he would be during the sentencing hearing.

## VII. Master hearing on January 23, 2026: DHS invokes "national security" as basis for denying a continuance, prompting the IJ to tell DHS if they want her to believe that, then they should go arrest Mr. Chan—four years after he was released on bond and nearly a year after the BIA decision.

44. More than a year after the I-130 was filed, a master hearing for an update on the status of the I-130 Petition was held on January 23, 2026. After it was established that the I-130 was still pending and that the proceedings would be continued, the attorney representing DHS stated that it was DHS' position that further continuances should not be granted as Mr. Chan's case is a "national security case."

45. The Removal Proceeding IJ responded to DHS by stating: "You're letting the respondent walk on the street and have been for years. That's a problem. You can't make both arguments." And: "DHS's actions and arguments are contradictory. You can't have it both ways."[4]

46. Given the events that followed a few weeks after these comments, it is fair to ask whether the IJ's remarks prompted or accelerated the arrest—afterall, she basically told DHS that they'd be foreclosed from making certain arguments as long as they let him continue to walk free. In other words, the "neutral adjudicator" of Mr.

[4] These remarks followed earlier ones in which the Removal Proceeding IJ stated "I'm surprised, and I think counsel was a bit surprised too, that his client's not in custody yet. We kind of all assumed that that's where it would be by now." These statements, however, prompted Mr. Chan's counsel to immediately clarify that he was not in fact surprised that ICE had not arrested his client. As explained on the record, Mr. Chan's counsel had been in communication with one of the Dallas ICE Deputy Chief Counsels, and as a result, he was given the impression that ICE was not going to arrest Mr. Chan unless he actually was ordered removed (instead of being granted re-adjustment of status).

Chan's removal proceedings told DHS that those arguments would not hold unless ICE arrested and detained Mr. Chan.

## VIII. The April 10, 2026 Arrest

47. On Friday, April 10, 2026, ICE officers did exactly that. Without any changed circumstance, without any violation of Mr. Chan's bond conditions, and without any individualized reason to believe he was a flight risk or a danger, ICE waited for Mr. Chan to get in his vehicle after leaving his known home address and then surrounded Mr. Chan in his vehicle.

48. When Mr. Chan asked to see a warrant, ICE refused to produce one. Mr. Chan can be heard pleading with the armed masked man at his car window to *please* tell him what is going on. *Please* show him the warrant. And *please no no please don't* each of the multiple times—in a single minute—the ICE officer told Mr. Chan he was going to break the window.

49. Despite Mr. Chan obviously being scared (justifiably—the man was in a mask and refusing to show him anything), using the word "please" repeatedly, and requesting nothing more than some sort of evidence the masked man at his window really was someone with a warrant and authority to arrest him, the ICE officer violently broke his car window and accosted him. Audio of the encounter, captured by Mr. Chan's dash cam, can be found at the following link: https://drive.google.com/file/d/10S2V34WfsF89acciTET01MdCI_41O0LI/view?usp=sharing

50. Mr. Chan was transported to the Plymouth County Correctional Facility, where he remains detained even though bond was posted in the amount of $15,000—

all of which remains in ICE's possession. The only bond hearing Mr. Chan was or will be afforded resulted in a determination that he was not a flight risk or danger. Mr. Chan proved the Bond-IJ right as he was nothing but a law-abiding citizen and loving husband during the four years he spent on bond. The agency's sole stated basis for detention is not a statute. Rather, the sole basis for the government's claim he is subject to mandatory detention is a regulation, (8 C.F.R. § 1003.19(h)(2)(i)(C)).

## ARGUMENT

### I. 8 C.F.R. § 1003.19(h)(2)(i)(C) Is Ultra Vires Because It Sweeps Into Mandatory Detention a Category of Noncitizens Congress Deliberately Omitted from 8 U.S.C. § 1226(c).

A. Congress's enumeration of mandatory-detention categories is exclusive.

51. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983) (citation and internal quotation marks omitted). This presumption is no mere interpretive nicety. It is an application of the canon *expressio unius est exclusio alterius*—the expression of one thing is the exclusion of another—"a maxim of long-standing use." *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003).

52. Section 1226(c) provides a textbook example of a statute in which Congress's inclusions and omissions are meaningful. Section 1226(c)(1) identifies five, and only five, categories of noncitizens subject to mandatory detention. Within subparagraph (D), Congress made an even more granular choice: from among the four subparagraphs of § 1227(a)(4), it selected *only* subparagraph (B) (terrorist activities). It did not select subparagraphs (A), (C), or (D). Congress "knows how" to include a

provision when it wants to. *Jama v. ICE*, 543 U.S. 335, 341 (2005). Its decision not to include § 1227(a)(4)(A) must be respected.

53. The *noscitur a sociis* canon reinforces this reading. Section 1226(c)(1)(D) pairs § 1227(a)(4)(B) with 8 U.S.C. § 1182(a)(3)(B)—the inadmissibility analog for terrorism. Congress thus grouped together two provisions that share a common subject: terrorism. "A word is known by the company it keeps." *Yates v. United States*, 574 U.S. 528, 543 (2015). Congress's choice of these two provisions, and no others, tells us precisely what sort of conduct Congress believed warranted the extraordinary remedy of detention without a bond hearing: terrorist conduct. General-security removability under § 1227(a)(4)(A)—which, as applied to Mr. Chan, covers shipment of airsoft parts to Hong Kong—does not keep that company.

B. <u>An agency cannot rewrite a statute by regulation.</u>

54. "It is a fundamental principle of our constitutional system that the legislative power is vested in Congress, and that the executive branch cannot exercise legislative functions." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024). An agency regulation must operate *within* the boundaries of the statute it implements; it may not add to, subtract from, or rewrite the statute's commands. *Id.* at 400 (courts must "independently determine the meaning of the statute"). Under the Administrative Procedure Act, federal courts must hold unlawful and set aside agency action found to be "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C).

55. 8 C.F.R. § 1003.19(h)(2)(i)(C) impermissibly expands § 1226(c). Congress placed five categories, and only five, in the mandatory-detention bucket. The regulation places *four* entire subparagraphs of § 1227(a)(4) in that bucket, even though

Congress selected only one. In doing so, the regulation "effectively creat[es] a new class of noncitizens subject to mandatory detention, depriving them of the right to a bond hearing that Congress expressly provided they should receive." *Leal-Hernandez v. Noem*, 803 F. Supp. 3d 409, 428 (D. Md. 2025) (quotation marks omitted); *see also Zabadi v. Chertoff*, No. 05-01796, 2005 WL 1514122, at *1 (N.D. Cal. June 17, 2005). That is the paradigm of *ultra vires* agency action.

C. <u>The Government Cannot Have It Both Ways.</u>

56. DHS's position in this case exposes the precise flaw at the heart of 8 C.F.R. § 1003.19(h)(2)(i)(C). On the one hand, DHS insists that shipping airsoft parts makes Mr. Chan a "national security" case warranting mandatory, no-bond detention. On the other hand, DHS contends—and the BIA agreed, over a dissent—that the § 1227(a)(4)(A)(i) charge itself requires no showing that Mr. Chan's conduct had any nexus to national security or foreign policy whatsoever. DHS has never argued that Mr. Chan's conduct posed a risk to national security—instead repeatedly avoiding this issue and Mr. Chan's detailed arguments made in support of them.

57. If DHS is right that § 1227(a)(4)(A)(i) reaches any export of any goods in violation of any law, regardless of any connection to the security or foreign policy of the United States, then the strongest anecdotal evidence of this fact would be Congress' decision not to include § 1227(a)(4)(A) among the grounds of removability that will subject a noncitizen to mandatory detention under § 1226(c). As the dissenting BIA member pointed out,

> The grounds for removal covered in this provision include espionage or sabotage, terrorists, Nazi persecutors, genocide and acts of torture, the recruitment or use of child soldiers, and aliens whose presence or activities in the United States "would have potentially serious adverse foreign policy consequences for the United States." The conduct resulting in the respondent's conviction is clearly not in this

> category, not by a long shot. In this regard, the broad interpretation adopted by the majority would cause anyone who violates any law prohibiting the export of anything, such as an innocuous food item without paying a small export tax, to be removable under section 237(a)(4)(A)(i) of the INA, 8 U.S.C. § 1227(a)(4)(A)(i). We are thus presented with "rare and exceptional circumstances" where strict adherence to the text of section 237(a)(4)(A)(i) would lead to an absurd result that is "demonstrably at odds with the intentions of its drafters."[5]

58. This interpretation and the conduct it encompasses, e.g., failing to pay a small tax on a bag of chips, contradicts the simultaneously made claim that noncitizens who engage in such conduct are, in terms of mandatory detention, no different than those who are removable for engaging in terrorist activities and committing aggravated felonies, to name a few. Both of these things surely cannot be true. And they are not. Afterall, Congress was sure to include those it wanted to be mandatorily detained in § 1226(c). It included § 1227(a)(4)(B) but excluded § 1227(a)(4)(A). The Executive cannot by regulation overrule that judgment.

**II. IMr. Chan's sudden arrest and current detention four years after an IJ made the individualized determination that he was neither a danger nor a flight risk and while his removal proceedings remain pending violates the Fifth Amendment's due process clause.**

59. Even if 8 C.F.R. § 1003.19(h)(2)(i)(C) were within the Executive's statutory authority—which it is not—it would still be unconstitutional as applied to Mr. Chan. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas v. Davis*, 533 U.S. 678, 690 (2001). "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). Lawful permanent residents like

---

[5] (App. Ex. 1 – BIA Bond Dec. dated 6/10/2025.)

Mr. Chan are entitled to the full protections of the Due Process Clause. *Demore v. Kim*, 538 U.S. 510, 523 (2003); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982).

60. To evaluate whether a form of civil detention violates procedural due process, courts apply the three-factor balancing test of *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *See Hernandez-Lara*, 10 F.4th at 27–28 (applying *Mathews* to detention under § 1226(a)). The factors are: (1) the private interest at stake; (2) the risk of erroneous deprivation of liberty through the procedures used and the value of additional safeguards; and (3) the government's interest, including any additional fiscal or administrative burdens. Each factor favors Mr. Chan decisively.

A. Mr. Chan's Interest in Physical Liberty is the Most Elemental of Liberty Interests.

61. "Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). An individual's "interest in freedom from physical detention by her own government is "the most elemental of liberty interests." *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004).

62. Mr. Chan is not merely losing liberty in the abstract. He is confined in a jail with people held for criminal offenses, separated from a wife who is a United States citizen, unable to work, unable to support the household, unable to prepare for immigration proceedings, and unable to meet with counsel. Moreover, his entire removal proceedings are being hastened by DHS who simultaneously has done nothing to hasten the adjudication of the I-130 his U.S. citizen wife filed on his behalf. The first Mathews factor weighs heavily—indeed, overwhelmingly—in his favor.

B. The Risk of Erroneous Deprivation of Liberty is Acute.

63. The second *Mathews* factor asks whether the procedures used risk an erroneous deprivation and whether additional safeguards would help. Here, the challenged regulation provides *no* individualized procedure at all. It operates as a categorical bar: because ICE has charged Mr. Chan under § 1227(a)(4)(A)(i) he cannot receive a bond—even though an IJ already granted one after determining that he did not pose a flight risk or a danger to the community. And, according to the government's interpretation, this ground of removability, and as a result mandatory detention under the regulation at § 1003.19(h)(2)(i)(C), may be applied even where there has been no conviction, arrest, or even violation of a criminal law. Such an arbitrary, ambiguous, and vague standard seem fraught with possibilities of erroneous deprivation of one's liberty.

64. The last six years speaks for itself on this point:

- Two-plus years on federal pretrial release with no violations—and a motion by U.S. Probation to remove curfew and GPS location monitoring conditions because Mr. Chan had been "nothing but cooperative."

- Completion of an 8-month federal sentence, after self-surrender, without incident.

- The bond IJ's finding that Mr. Chan and his conduct was not what Congress was targeting for removal in § 1227(a)(4)(A)(i);

- More than four years on an immigration bond, with perfect attendance at every scheduled hearing, full compliance with every condition, no new arrests, no new charges, continuous employment, and no attempted departure from the United States.

- One of three BIA panel members agreed with Mr. Chan's interpretation of § 1227(a)(4)(A)(i);

- Marriage to a United States citizen; a pending, bona fide I-130; and DHS's own concession that Mr. Chan is eligible to re-adjust status if the I-130 is approved; and

- Circumstances which make it more likely than not that Mr. Chan's arrest was prompted by the IJ telling DHS that it better go arrest Mr. Chan if it wants to argue he should be ordered removed based on its claim he is a security risk.

65. In light of the above, the fact that the likelihood of a noncitizen being erroneously deprived of their liberty under a regulation rather than the statute passed, seems obvious. This conclusion is only bolstered by the fact that when Mr. Chan was given an individualized bond determination it resulted in bond being set. And the last four years of Mr. Chan's life since posting bond have demonstrated that was the right call.

C. The Government has no legitimate interest in detaining Mr. Chan for the duration of proceedings

66. The Fifth Amendment permits detention only where 'heightened, substantive due process scrutiny' finds a 'sufficiently compelling' governmental need." *Demore*, 538 U.S. at 548 (Souter, J., concurring in part and dissenting in part) (quoting *Reno v. Flores*, 507 U.S. 292, 316 (1993) (O'Connor, J., concurring)). The only legitimate governmental interests that can justify civil immigration detention are ensuring appearance at removal proceedings and protecting the community against danger. *Zadvydas*, 533 U.S. at 690–91.

67. The government cannot articulate either interest here. Mr. Chan has appeared for every hearing for four-plus years. He has complied with every condition. He is married to a U.S. citizen, has a pending I-130, and has every reason to remain in the United States to litigate his case. Judge Wolf—the sentencing judge—found, and the prosecutor conceded, that his conduct posed no risk to the security or foreign policy of the United States. The government *may* assert a categorical interest in administrative efficiency, but "that a detention statute is otherwise constitutional is irrelevant to the question whether it is constitutional as applied to a person whose circumstances preclude any legitimate governmental interest in detaining him." *See Zadvydas*, 533 U.S. at 696–97.

68. The Supreme Court's decision in *Demore v. Kim* does not save the regulation. *Demore* sustained Congress's *statutory* decision, in § 1226(c), to require brief mandatory detention of certain categories of criminal aliens—relying heavily on specific congressional findings about flight and recidivism in those enumerated categories. *Demore*, 538 U.S. at 518–21. There are no analogous congressional findings supporting mandatory detention of the § 1227(a)(4)(A) category, because Congress never put that category in § 1226(c) in the first place. *Demore*'s deferential review of a statute enacted by Congress cannot be extended to a regulation the Executive wrote for itself.

**III. The status quo is release back on bond.**

69. "The status quo for purposes of injunctive relief is . . . the last actual, peaceable, non-contested status which preceded the pending controversy." *Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974). The "pending controversy" here is Mr. Chan's April 10, 2026 re-detention. The status *preceding* that controversy was his four-plus years of liberty on bond—most recently on a $10,000 bond set and accepted without objection by DHS. That status was "peaceable" and "non-contested": Mr. Chan appeared for every hearing, committed no violations, and ICE did not seek his re-detention at any point between the BIA's June 2025 decision and April 10, 2026.

70. An order of release on a $10,000 bond does not change the status quo; it restores it. It returns the parties to the position they occupied before the government's unilateral act of re-detention. To treat the jail cell as the baseline would "reward the government for its swift and unilateral deprivation of liberty," creating "a perverse incentive for executive agencies to act precipitously and without process when arresting

and subjecting individuals to civil detention despite the absence of any justification . . . for such detention."

71. The relief Mr. Chan seeks is therefore modest: a return to the bond conditions he was living under the day before ICE broke his window. If DHS believes changed circumstances warrant different or additional conditions, § 1226(a) provides a forum—a hearing before an IJ at which DHS may make its case. A habeas court, however, need not wait for that hearing to restore the status quo.

## CLAIMS FOR RELIEF

### I. Count I: Unlawful Detention Contrary to 8 U.S.C. § 1226 (Ultra Vires Regulation)

72. Petitioner incorporates the foregoing paragraphs by reference. Respondents' detention of Mr. Chan pursuant to 8 C.F.R. § 1003.19(h)(2)(i)(C) exceeds the authority granted to the Executive by 8 U.S.C. § 1226, is *ultra vires*, and is subject to invalidation under 5 U.S.C. § 706(2)(C) and the habeas remedy of 28 U.S.C. § 2241.

### II. Count II: Violation of the Fifth Amendment to the United States Constitution (Procedural and Substantive Due Process)

73. Petitioner incorporates the foregoing paragraphs by reference.

74. Respondents' sudden detention based on nothing more than a regulation which cannot be squared with Congress' intent expressed in § 1226(c) violates the Fifth Amendment's guarantee of procedural and substantive due process. This is particularly true as applied to Mr. Chan whose sudden and unnecessarily violent arrest by ICE came four years after he was released on bond following an individualized bond hearing at which it was determined Mr. Chan is neither a flight risk nor danger.

75. This is particularly true given the circumstances seem to demonstrate Mr. Chan's arrest and detention without release now—under all of the circumstances—makes it

reasonable to believe ICE was motivated by a desire to artificially bolster its unfounded claims that Mr. Chan is a security risk.

76. The *Mathews* factors weigh decisively in Mr. Chan's favor.

***Count III: Declaratory Relief (28 U.S.C. §§ 2201–2202)***

77. Petitioner incorporates the foregoing paragraphs by reference.

78. A justiciable controversy exists between the parties as to the legality of 8 C.F.R. § 1003.19(h)(2)(i)(C) as applied to Mr. Chan. Mr. Chan is entitled to a declaration that the regulation is ultra vires and unconstitutional as applied to him.

## PRAYER FOR RELIEF

Wherefore, Petitioner respectfully request this Court to grant the following:

(1) Assume jurisdiction over this matter;

(2) Order that Petitioner shall not be transferred outside the District of Massachusetts;

(3) Issue an Order to Show Cause ordering Respondents to show cause why this Petition should not be granted within three days;

(4) Declare that Petitioner's detention is unlawful under the INA and U.S. constitution;

(5) Issue a Writ of Habeas Corpus ordering Respondents to release Petitioner immediately back on the same bond he has dutifully complied with for more than 4 years;

(6) Award Petitioner's attorney's fees and costs under the Equal Access to Justice Act ("EAJA"), as amended, 28 U.S.C. § 2412, and on any other basis justified under law;

(7) Order that Respondents' return Petitioner's property including but not limited to, his state and foreign identity documents, employment authorization card, and driver's license.

(8) Grant any further relief this Court deems just and proper.

(9) Respectfully submitted,

/s/ Molly McGee
Attorney Molly McGee
Law Office of Molly McGee
385 Broadway Suite 303
Revere, MA 02151
P: 617-208-4141
*molly@mollymcgeelaw.com*
*Counsel for Petitioner*

**VERIFICATION PURSUANT TO 28 U.S.C § 2242**

I, Dan Gividen, declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that I have been counsel of record for Petitioner Lionel Chan throughout his bond and removal proceedings, that I have drafted and prepared this Petition on his behalf, and that the factual allegations contained herein are true and correct to the best of my knowledge, information, and belief based upon my representation of Mr. Chan, my review of the administrative record in his immigration and criminal proceedings, and my communications with him and his family.

Dated: April 14, 2026

RESPECTFULLY SUBMITTED,
*/s/ Dan Gividen*
Dan Gividen
Texas Bar. No. 24075434
18208 Preston Rd., Ste. D9-284
Dallas, TX 75252
972-256-8641
Dan@GividenLaw.com